Evan Sarzin, P.C.
Counsel to Plaintiff
40 Exchange Place, Suite 1300
New York, New York 10005
(212) 344-6500
By: Evan Sarzin, Esq. (ES-3709)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LISA M. REILLY, | Docket No.:  08 Civ. 205 |
| Plaintiff, | *JURY TRIAL DEMANDED* |
| - against - | AMENDED COMPLAINT |
| REVLON, INC., DR. ROBERT KRASNER, and LINDA PIACENTINI, | |
| Defendants. | |

Plaintiff LISA M. REILLY, by and through her counsel, Evan Sarzin, P.C., complaining of the above-named defendants, respectfully alleges as follows:

PRELIMINARY STATEMENT

Plaintiff hereby files and serves the within Amended Complaint, pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure.  The within Amended Complaint is timely, being filed and served within 20 days from the date of the original complaint, and is the first amendment of the pleadings.  Plaintiff incorporates all of the factual allegations, jurisdictional statements, and causes of action contained within the Plaintiff's original complaint, while further adding a timely Title VII claim against the defendant, Revlon Inc., and a state law claim against all of the defendants, for negligent infliction of emotional distress.   Pursuant to Fed. Rule Civ. Pro 15(a)(3), further responsive pleadings by defendants, if any, are to be made no later than ten (10) days from the date of service of Plaintiff's Amended Complaint.

PARTIES

1.   Upon information and belief, at all times relevant, defendant REVLON, INC. (hereinafter, "REVLON"), was and is a foreign corporation licensed to do business in the State of New York, which maintains an office at 237 Park Avenue, New York, New York.

2.   Upon information and belief, at all times relevant, defendant DR. ROBERT KRASNER (hereinafter, "DR. KRASNER") was and is an individual residing in the City and County of New York.

3.   Upon information and belief, at all times relevant, defendant LINDA PIACENTINI (hereinafter, "PIACENTINI") was and is an individual residing in the State of New York, County of  Nassau.

4.   At all times relevant, plaintiff LISA M. REILLY (hereinafter, "REILLY") was a resident of the State of New York.

JURISDICTION

5.   This court has jurisdiction over this case pursuant to 28 U.S.C. § 1331, based upon a federal question under the federal statutes set forth in the following paragraph of this complaint.  This Court further has jurisdiction over Plaintiff's Title VII claim, as Plaintiff filed her EEOC Charge, and received an EEOC Right to Sue Letter on or about October 22, 2007, and filed her initial pleadings within 90 days of the receipt of said Letter.  The within amended pleadings relate back to the time of the initial pleadings, for purposes of Title VII, as per Federal Rules of Civil Procedure.

NATURE OF ACTION

6.  This is an action for employment discrimination and wrongful termination, in violation of the New York State Human Rights Law (NYSHRL), Section 296 of N.Y. Exec. Law; the New York City Human Rights Law (NYCHRL), Section 8-502 of the N.Y.C. Admin. Code; The Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. § 2601 *et seq.*; the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 *et seq.*; the Pregnancy Discrimination Act of 1978 (PDA), and Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. § 2000 *et seq.* Plaintiff further alleges a claim against all defendants, for negligent infliction of emotional distress.

7.  On July 31, 2006, Ms. REILLY filed a charge of discrimination against REVLON with the Equal Employment Opportunity Commission (EEOC). By letter dated October 19, 2007, received October 22, 2007, the EEOC advised Ms. REILLY of her right to commence this action within 90 days thereafter. A copy of the letter is attached hereto as Exhibit A and made a part of this complaint.

8.  This action was commenced within 90 days of the issuance of the Notice of Right to Sue Letter, dated October 19, 2007 and received on October 22, 2007. Pursuant to federal statute, the within Amended Pleadings relate back to the time of the original pleadings (filed on _____, 2008), for purposes of Title VII's statutory time frames.

<u>FACTS COMMON TO ALL CLAIMS FOR RELIEF</u>

9.  Upon information and belief, REVLON is a wholly owned subsidiary of MacAndrews & Forbes Holdings, Inc. (hereafter "M&F"), which manufactures and sells cosmetics in interstate commerce and employs more than 50 employees.

10. At all times relevant, DR. KRASNER was Vice President of Medical Affairs for M&F and was responsible for the operation of REVLON'S Medical Services Department (MSD).

11. In May, 1995, Ms. REILLY began working as executive assistant to DR. KRASNER in the MSD.  At all times relevant, DR. KRASNER was Ms. REILLY's direct supervisor.

12. Ms. REILLY received a degree in Business Administration from Lynchburg College in 1986.

13. At all times during her employment, Ms. REILLY received positive performance reviews as well as regular salary increases and bonuses during her employment with REVLON.

14. In the year 2000, REVLON promoted Ms. REILLY to Manager of the MSD, at which time she received a large salary increase and additional employment benefits, as well as a bonus from M and F.

15. In late 2004, Ms. REILLY became pregnant.  Her projected due date was September 5, 2005.

16. DR. KRASNER learned of Ms. REILLY's pregnancy in February 2005.

17. In summer 2005, Ms. REILLY requested leave under the FMLA.  Her twelve-week leave was to commence upon the date she delivered.

18. At the time Ms. Reilly requested leave, the MSD was staffed by three persons, consisting of DR. KRASNER, REILLY and Bernadette Barry, a nurse practitioner.

19. Ms. Barry was also pregnant.   Ms. Barry's FMLA leave was to terminate on September 15, 2005, and thus overlapped with Ms. REILLY's leave, as both the nurse practitioner and Ms. REILLY were pregnant at the same time.

20. DR. KRASNER acknowledged his unhappiness on repeated occasions with the fact that Ms. REILLY's leave overlapped with the nurse practitioner's leave.

21. On June 23, 2005, REVLON honored Ms. REILLY and the nurse practitioner with a service award ceremony.  Because DR. KRASNER was in Germany on business on that date, REVLON'S Human Resources Dept. (HRD) requested that he prepare a written statement regarding their years of service to be read at the ceremony.  DR. KRASNER failed to provide the requested written statement.

22. DR. KRASNER'S failure to recognize their years of service was disappointing, embarrassing and extremely worrisome to Ms. REILLY, particularly in light of his espoused displeasure with having to accommodate his staff's maternity leave schedules.

23. On July 20, 2005, Ms. REILLY informed DR. KRASNER that due to the breech position of the fetus, her obstetrician scheduled a caesarean section on August 29, 2005.

24. DR. KRASNER objected to the date of the caesarean section, stating that it interfered with his family vacation to Scotland.

25. In June 2005, Ms. REILLY grew anxious because DR. KRASNER, despite having been notified in November 2004 of the nurse practitioner's leave, had not yet hired a temporary registered nurse practitioner to begin on June 18, 2005.

26. On June 17, 2005, the day before the nurse practitioner's maternity leave commenced, a temporary registered nurse began training in the MSD.  The nurse

practitioner was able to provide only three hours of orientation due to lateness of the hiring and her departure the following day.

27. Upon the nurse practitioner's departure, Ms. REILLY was charged with the responsibility for training the temporary registered nurse. Ms. REILLY repeatedly asked DR. KRASNER for help with orientation of the temporary registered nurse. DR. KRASNER responded, "It's not my problem that you and your co-worker planned your pregnancies together."

28. Ms. REILLY thereafter requested that DR. KRASNER hire a temporary employee to cover her FMLA leave.

29. On August 8, 2005, she began training the temporary employee for her FMLA leave.

30. Notwithstanding his hiring a temporary replacement, DR. KRASNER had a company cell phone and laptop computer issued to Ms. REILLY, and installed a wireless Internet connection in her apartment, so REILLY could continue to work from home during her FMLA leave.

31. On August 19, 2005, Ms. REILLY and DR. KRASNER met with Mary Massimo, President of HRD.  At that time, DR. KRASNER informed Massimo that he had given Ms. REILLY a computer to work from home.  Massimo responded by raising her hand and stating, "I didn't hear that."

32. During August 2005, Ms. REILLY became overwhelmed with the increased workload and training responsibilities.  During this period Ms. REILLY experienced rapid heart palpations, higher blood pressure, excessive  bouts of crying, decreased appetite, etc., which was documented by the temporary registered nurse in Ms.

REILLY's MSD chart.  The temporary registered nurse advised Ms. REILLY to go out on FMLA now because of the work stress she was under, as being detrimental to her health and to the pregnancy.

33. The temporary registered nurse explained to Ms. REILLY that during these bouts of stress a hormone called cortisol is released that could cause harm to the baby. Ms. REILLY than asked DR. KRASNER about the effects of cortisol on the fetus and if Ms. REILLY should go out on FMLA now DR. KRASNER responded by saying "You're fine -- it is just first-time mother jitters".  DR. KRASNER then directed the temporary nurse practitioner to go to the Narcotic Safe in the MSD and dispense Klonopin, an anti-psychotic drug to Ms. REILLY.

34. The temporary registered nurse refused to dispense the Klonopin to Ms. REILLY because it was contraindicated for her pregnancy..  The temporary registered nurse also voiced her concerns about the way DR. KRASNER treated Ms. REILLY and the amount of stress DR. KRASNER put on her during her pregnancy.

35. On August 17, 2005, the temporary registered nurse advised Ms. REILLY that she could no longer continue to work with DR. KRASNER, informing Ms. REILLY that she was losing sleep worrying about the way in which DR. KRASNER practiced medicine.  The temporary registered nurse explained to Ms. REILLY that ordering her to dispense Klonopin to Ms. REILLY was the incident that pushed her to the breaking point.

36. Ms. REILLY'S treating physicians subsequently confirmed that Klonopin that DR. KRASNER was contraindicated due to evidence of its causing the baby withdrawals after birth.

37. In mid-August, DR. KRASNER interviewed a nurse practitioner candidate from Rhode Island to replace the nurse practitioner who was out on maternity leave and due back to work on Sept. 5, 2005.

38. Dr. KRASNER hired the Rhode Island candidate to permanently replace her co-worker who was out on maternity leave, before her co-worker returned from leave or formally resigned.

39. Ms. REILLY was aware that DR. KRASNER had replaced her co-worker before her return from maternity leave and voiced her concern to DR. KRASNER that his conduct violated the FMLA.

40. Ms. REILLY suffered extreme mental anguish as a result of knowing that DR. KRASNER replaced her co-worker for no reason other then she had taken FMLA leave to bear a child.

41. Ms. REILLY further feared retaliation from any objection she might have to working during her FMLA leave in the event she needed to begin her leave before her due date.

42. Ms. REILLY's distress about possibly losing her job exacerbated anxiety she felt because her husband had recently began a new job after a year and a half of being unemployed.

43. On Sept. 2, 2005, Ms. REILLY delivered her child at New York Presbyterian Hospital.  While Ms. REILLY and her daughter were in the aforementioned hospital, DR. KRASNER, who had hospital privileges and posed as Ms. Reilly's mentor and confidante, did not visit Ms. REILLY during her admission.

44. On September 7, 2005, Ms. REILLY was voluntarily admitted to the Payne Whitney Psychiatric Clinic of New York Presbyterian Hospital and was diagnosed with severe post-partum depression.

45. Ms. REILLY's relatives notified DR. KRASNER and HRD of her condition on or about the same date.

46. On September 10, 2005 and September 17, 2005, DR. KRASNER visited Ms. REILLY at Payne Whitney.

47. During DR. KRASNER's visits to Payne Whitney, he requested that Ms. REILLY work during her leave and questioned her regarding existing work assignments from a list he had stored on his palm pilot. DR. KRASNER also requested that Ms. REILLY have her physician contact him regarding her care. DR. KRASNER informed Ms. REILLY that none of the physicians were returning his phone calls.

48. Ms. REILLY responded that she was unable to work at the hospital or during her leave due to her depression.

49. DR.. KRASNER assured Ms. REILLY at that time that her job was safe and she could take as much time as she needed to recover.

50. On September 22, 2005, Ms. REILLY was discharged from New York Presbyterian - Payne Whitney Psychiatric Center under the care of Judith Gold, MD.

51. On October 2, 2005, Ms. REILLY's husband telephoned HRD and informed REVLON that she would remain on medical leave due to her post-partum depression until further notice from physician, Judith Gold, M.D.

52. By letter dated December 2, 2005, HRD informed Ms. REILLY that her FMLA had expired on November 24, 2005.

53. DR. KRASNER assured Ms. REILLY in multiple telephone conversations after November 24, 2005, that he extended her job security and she could take as much time as she needed to recover.

54. In January of 2006, Ms. REILLY's doctor (Judith Gold, MD) submitted a written certification to Darren Pratt, Sr. Disability Case Manager of MetLife, verifying that Ms. REILLY could return to work part-time in February of 2006, and full-time in March of 2006.

55. On January 24, 2006, Ms. REILLY telephoned DR. KRASNER and informed him that she was certified to return by Judith Gold, MD to work part-time as of February 8, 2006.

56. They agreed that she would return to work part-time on February 8, 2006.  HRD was to contact Ms. REILLY in advance to re-confirm the return date.

57. At no time did DR. KRASNER or any other REVLON representative inform Ms. REILLY that REVLON was unable to accommodate her request to work part-time.

58. On February 8, 2006, PIACENTINI, Vice President of Human Resources, telephoned Ms. REILLY and told her that her position had been filled because the MSD needed a full-time employee.

59. At that time, Ms. REILLY offered to come back on a full-time basis instead of part-time, which was recommended by Judith Gold, MD.  PIACENTINI advised Ms. REILLY again that the position had been filled.

60. She was further informed that DR. KRASNER was fully aware of this fact.

61. On February 10, 2006, Ms. REILLY was informed by DR. KRASNER in a telephone conversation with him that the position had not been filled and he had extended her job security until February 15, 2006.

62. Ms. REILLY nevertheless was informed by Helene Pliner of HRD on the same date that her position had been eliminated.

63. On February 23, 2006, Ms. REILLY was advised by Darren Pratt, Senior Disability Case Manager of MetLife, REVLON'S disability carrier, that MetLife's computerized notes documented that Debbie Goon of HRD had approved Dr. Gold's request to return to work on a part-time basis on January 21, 2006.

64. In an abrupt reversal, on March 3, 2006, PIACENTINI of HRD notified Ms. REILLY that she would be terminated as of February 28, 2006.   PIACENTINI of HRD also stated that Ms. REILLY'S position had been opened for some time, but needed to be filled on a full time basis.

65. On March 8, 2006, Ms. REILLY contacted Patrick Rohan, Chief of Staff  & Counsel of M & F regarding returning the laptop, which contained confidential information for Ronald Perelman and Howard Gittis.  Ms. REILLY informed Patrick Rohan that PIACENTINI wanted to send a courier for the laptop. Ms. REILLY advised Rohan to make arrangements with REVLON security to pick up laptop.

66. On February 27, 2006, Ms. REILLY spoke with PIACENTINI.  PIACENTINI said that her job security had been extended several weeks without notice, but that REVLON eventually had to fill the position.

67. By letter dated March 20, 2006 from PIACENTINI, REVLON offered Ms. REILLY a severance package that included eight months continued pay and benefits, a

non-prorated discretionary bonus, her unused vacation pay and the use of outplacement services, in consideration for a separation agreement and general release.  She declined the severance offer.

68. On March 21, 2006 Ms REILLY received a FEDEX delivery with a letter dated March 20th, 2006, from Robert Kretzman, General Counsel and Secretary of REVLON, and a severance package agreement.  Robert Kretzman acknowledged Ms. REILLY's years of service and many contributions to the MRD.  Robert Kretzman also stated that Ms. REILLY's position as Manager was filled and was an essential position for the operation of the medical department.  Robert Kretzman also apologized for any "miscommunication" that may have occurred.

69.  Upon information and belief, REVLON replaced Ms. REILLY with a non-disabled, older, unmarried woman who had no children, and who possessed less than one year of experience in the position and did not possess a college education.

70. REVLON permitted non-disabled employees, including male employees, to modify their work schedules for various reasons not including pregnancy --  allowing part-time hours to said employees for short durations.

71. At all relevant times, DR. KRASNER possessed more authority in the MSD than merely to carry out the personnel decisions of others.

72. Upon information and belief, the decision as to whether Ms. REILLY would be allowed to return to work was in DR. KRASNER'S sole discretion.

73. At all times relevant, the conduct of DR. KRASNER and PIACENTINI, and thus of REVLON, were undertaken with ill will, malice and reckless disregard or depraved indifference for Ms. REILLY'S rights under federal and state laws.

74. By reason of REVLON terminating Ms. REILLY, Ms. REILLY has lost the benefit of her pension, which is no longer offered to REVLON's employees.

## FIRST CLAIM FOR RELIEF AGAINST REVLON
(ADA Violation)

75. Ms. REILLY repeats and realleges her allegations contained in paragraphs 1 through 74 as if fully set forth herein.

76. REVLON'S refusal to make reasonable accommodation for Ms. REILLY's depression constituted unlawful intentional discrimination in violation of 42 U.S.C. § 12112(b)(5)(A).

77. Ms. REILLY was otherwise qualified to perform the duties of the position, particularly where DR. KRASNER was willing and in fact encouraged Plaintiff to work from home during her leave.

78. DR. KRASNER and REVLON'S conduct was with malice or reckless indifference to Ms. REILLY's federally protected rights under the ADA.

79. By virtue of the foregoing, Ms. REILLY is entitled to compensatory damages in the sum of $300,000.00, punitive damages in the sum of $15 million, plus attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF AGAINST REVLON
(PDA Violation)

80. Ms. REILLY repeats and realleges the allegations contained in paragraphs 1 through 79 as if set forth fully herein.

81. Upon information and belief, REVLON terminated Ms. REILLY based on her pregnancy and/or delivery of a child.

82. By virtue of the foregoing, Ms. REILLY is entitled to recover of REVLON her compensatory damages in the sum of $10 million, actual damages including front pay, back pay and reinstatement, punitive damages in the sum of $15 million, plus attorneys' fees and costs.


THIRD CLAIM FOR RELIEF AGAINST REVLON, DR. KRASNER AND
PIACENTINI
(Interference with FMLA Rights)

83. Ms. REILLY repeats and realleges her allegations contained in paragraphs 1 through 82 as if fully set forth herein.

84. DR. KRASNER and PIACENTINI are employers as the term is defined under the FMLA.

85. DR. KRASNER's request that Ms. REILLY work during her FMLA leave, the issuance of a computer and cell phone and installation of an Internet connection in her home, and the imposition of work-related questions while she was at Payne Whitney constituted interference with the exercise of her FMLA rights.

86. PIACENTINI's refusal to make reasonable accommodation for Ms. REILLY also constituted interference with the exercise of her FMLA rights.

87. By virtue of the foregoing, pursuant to 29 U.S.C. §§ 2615 and 2617, Ms. REILLY is entitled to recover of REVLON, DR. KRASNER and PIACENTINI twice her lost wages with interest thereon, actual damages, reinstatement, attorneys' fees and costs.

<u>FOURTH CLAIM FOR RELIEF AGAINST REVLON,</u>
<u>DR. KRASNER AND PIACENTINI</u>
(Retaliation in Violation of FMLA)

88. Ms. REILLY repeats and realleges her allegations contained in paragraphs 1 through 87 as if fully set forth herein.

89. Upon information and belief, REVLON, DR. KRASNER and PIACENTINI terminated REILLY based on her exercise of her right to FMLA leave.

90. By virtue of the foregoing, pursuant to 29 U.S.C. §§ 2615 and 2617, Ms. REILLY is entitled to recover of REVLON, DR. KRASNER, PIACENTINI twice her lost wages with interest thereon, actual damages, reinstatement, attorneys' fees and costs.

<u>FIFTH CLAIM FOR RELIEF AGAINST REVLON</u>
(Violation of NYSHRL, N.Y. Exec. Law § 296.1(a))

91. Ms. REILLY repeats and realleges her allegations contained in paragraphs 1 through 90 as if fully set forth herein.

92. REVLON'S termination and failure to make reasonable accommodation for Ms. REILLY on the basis of her depression constituted unlawful discrimination.

93. By virtue of the foregoing, pursuant to NYSHRL § 296, Ms. REILLY is entitled to compensatory damages in the sum of $10 million, plus attorneys' fees and costs.

<u>SIXTH CLAIM FOR RELIEF AGAINST REVLON</u>
(Violation of NYSHRL, N.Y. Exec. Law § 296.6)

94. Ms. REILLY repeats and realleges her allegations contained in paragraphs 1 through 93 as if fully set forth herein.

95. Upon information and belief, REVLON'S termination of Ms. REILLY was based on her pregnancy and constituted unlawful discrimination on the basis of her sex.

96. By virtue of the foregoing, pursuant to NYSHRL § 296, Ms. REILLY is entitled to recover compensatory damages in the sum of $10 million, plus attorneys' fees and costs.

<u>SEVENTH CLAIM FOR RELIEF AGAINST PIACENTINI</u>
(Aiding and Abetting - Violation of NYSHRL, N.Y. Exec. Law § 296.6)

97. Ms. REILLY repeats and realleges her allegations contained in paragraphs 1 through 96 as if fully set forth herein.

98. PIACENTINI's flat denial of Ms. REILLY's request for a reasonable accommodation aided and abetted REVLON in its unlawful discriminatory termination of Ms. REILLY.

99. By virtue of the foregoing, Ms. REILLY is entitled to recover of PIACENTINI compensatory damages in the sum of $10 million, plus attorneys' fees and costs.

## EIGHTH CLAIM FOR RELIEF AGAINST DR. KRASNER
(Aiding and Abetting –Violation of NYSHRL, N.Y. Exec. Law § 296.6)

100.     Ms. REILLY repeats and realleges her allegations contained in paragraphs 1 through 99 as if fully set forth herein.

101.     DR. KRASNER's refusal to allow Ms. REILLY to return to work and failure to provide a reasonable accommodation for her although Ms. Goon had reported to MetLife that such accommodation could be made constituted DR. KRASNER's aiding and abetting of REVLON in its unlawful discriminatory termination of REILLY based on her disability.

102.     By virtue of the foregoing, pursuant to § 296.6 NYSHRL, Ms. REILLY is entitled to recover of DR. KRASNER compensatory damages in the sum of $10 million, plus attorneys' fees and costs.

## NINTH CLAIM FOR RELIEF AGAINST REVLON
(Violation of NYCHRL, N.Y. Admin. Code § 8-107)

103.     Ms. REILLY repeats and realleges her allegations contained in paragraphs 1 through 102 as if fully set forth herein.

104.     REVLON'S termination and refusal to make reasonable accommodation for Ms. REILLY on the basis of her depression constituted unlawful discrimination.

105.     By virtue of the foregoing, pursuant to NYCHRL, Ms. REILLY is entitled to recover of REVLON compensatory damages in the sum of $10 million, punitive damages in the sum of $15 million, plus attorneys' fees and costs.

<u>TENTH CLAIM FOR RELIEF AGAINST REVLON</u>
(Violation of NYCHRL, N.Y. Admin. Code § 8-107)

106.    Ms. REILLY repeats and realleges her allegations contained in paragraphs 1 through 105 as if fully set forth herein.

107.    REVLON'S termination and refusal to make reasonable accommodation for Ms. REILLY on the basis of her pregnancy constituted unlawful discrimination in violation of § 8-502 of the NYCHRL.

108.    By virtue of the foregoing, Ms. REILLY is entitled to recover of REVLON compensatory damages in the sum of $10 million, punitive damages in the sum of $15 million, plus attorneys' fees and costs.

<u>ELEVENTH CLAIM FOR RELIEF AGAINST REVLON</u>
(Violation of 42 U.S.C. §2000(e) *et seq.* – Title VII*)*

109.    Ms. REILLY repeats and realleges her allegations contained in paragraphs 1 through 108 as if fully set forth herein.

110.    REVLON terminated Ms. REILLY, and refused to make reasonable accommodation for Ms. REILLY, on the basis of her pregnancy and gender.  Such acts constituted unlawful discrimination in violation of 42 U.S.C. Section 2000(e) *et seq*, Title VII of the Civil Rights Act of 1964 (As amended).

111.    During the course of Plaintiff's employment with the defendants, defendant REVLON engaged in selective enforcement of its own internal policies, regarding employee leave requests and modified work schedules.  Upon information and belief, REVLON favored such requests of male employees over female employees.

112.      Defendant REVLON further engaged in unequal terms of conditions of employment against Ms. Reilly based on her gender, by failing to afford Ms. Reilly the full protection of federal laws (including the ADA and the FMLA), as such federal laws and protections were fully afforded to male employees, who requested Family Medical Leave, Reasonable Accommodation Requests, and other such accommodations based on (non-pregnancy related) disabilities.

113.      The aforesaid unequal terms and conditions of employment based on gender, and the termination of Plaintiff LISA REILLY based on her gender, violate 42 U.S.C. Section 2000(e), *et seq.*

114.      As a direct result of defendants' violations, Plaintiff LISA REILLY suffered economic damages, including loss of income, back pay, front pay, loss of the value of benefits and bonuses.  Plaintiff further suffered severe emotional harm with manifested physical symptoms of sickness, along with psychological damage. Accordingly, Plaintiff is entitled to compensatory damages for her economic losses, emotional distress, pain and suffering, in an amount to be determined by a jury, but no less than $10 million.

115.      The defendants' lack or remorse or repentance, and the resulting harm to plaintiff, warrants an award of punitive damages under Title VII, along with statutory attorneys fees, miscellaneous costs, and all other awards as seen fit, in sum total to be determined by a jury, but no less than $15 million.

TWELFTH CLAIM FOR RELIEF AGAINST REVLON,
DR. ROBERT KRASNER and LINDA PIACENTINI
(Violation of 42 U.S.C. §2000(e) *et seq.* – Title VII*)*

116.     Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 115, with the same force and effect as though fully set forth herein.

117.     The defendant REVLON, INC.,  through its agents, and individual defendants DR. ROBERT KRASNER and LINDA PIACENTINI, condoned and encouraged the discriminatory harassment of plaintiff at work, jeopardized the health of Ms. Reilly (while she was pregnant and afterwards), and further jeopardized the health of Ms. Reilly's baby, by engaging in the grossly negligent and reckless acts and omissions, as set forth in the Factual Allegations, above.  Said acts had a foreseeable emotional impact of great harm to plaintiff.

118.     Dr. Krasner's pressuring Plaintiff over work assignments, his attempts to force her to work while on FMLA leave, and defendant Krasner's pressuring Plaintiff about work, *while Plaintiff was in a psychiatric facility for depression and work-related stress,* were part of a pattern of extreme and outrageous conduct by defendant Krasner, with a foreseeable emotional impact of great harm to plaintiff.

119.     Defendants knew and/or should have known that their extreme and outrageous conduct, acts and omissions, as alleged in the within complaint, would likely cause Plaintiff to suffer severe emotional distress.  Any reasonable person would have known that the acts of the defendants would have such foreseeably harmful and traumatic impact (emotional, physical and psychological) on Plaintiff.

120.     Defendants knew and/or should have known of the grave harmful impact and severe emotional distress that they subjected Plaintiff to, yet were indifferent to the consequences of their actions.

121.      As a result of the defendants' conduct, as set forth in the above paragraphs and in the Factual Allegations, Plaintiff did suffer great emotional harm and distress, with concurrent physical symptoms and illness, requiring medication, further loss of ability to work, psychiatric treatment, counseling, and exacerbation of depression, sleeplessness, headaches, insomnia, and other physical pain and suffering from resulting physical sickness / physically manifested injury.

122.      The aforementioned defendants should have known of the harm plaintiff would suffer and did suffer, as a result of their conduct, yet failed to prevent said emotional harm from occurring.  Specifically, as a direct result of the defendants' extreme and outrageous conduct, plaintiff suffered prolonged anxiety, depression, insomnia,          and consequent loss of self-esteem and pride.

123.       As a result of defendants' violations, their  lack of remorse or repentance, and the resulting harm to plaintiff, plaintiff is entitled to compensatory damages, punitive damages, attorneys fees, miscellaneous costs, and all other awards as seen fit, in sum total to be determined by a jury, but no less than $15 million.

WHEREFORE, plaintiff REILLY demands judgment as follows:

a.      On the First Claim for Relief, compensatory damages in the sum of $300,000, punitive damages in the sum of $15 million, plus attorneys' fees and costs;

b.      On the Second Claim for Relief, compensatory damages in the sum of $10 million, punitive damages in the sum of $15 million,  plus attorneys' fees and costs;

c.      On the Third and Fourth Claims for Relief, twice her lost wages, with interest thereon, actual damages, including the loss of her pension, reinstatement, plus attorneys' fees and costs;

d.      On the Fifth, Sixth, Seventh and Eighth Claims for Relief, compensatory damages in the sum of $10 million, plus attorneys' fees and costs;

e.      On the Ninth and Tenth Claims for Relief, compensatory damages in the sum of $10 million, punitive damages in the sum of $15 million, plus attorneys' fees and costs;

f.      On the Eleventh Claim For Relief, compensatory damages in the sum of $10 million, punitive damages in the sum of $15 million, plus attorneys' fees and costs; and

g.      On the Twelfth Claim For Relief, compensatory damages in the sum of $10 million, punitive damages in the sum of $15 million, plus attorneys' fees and costs; and such additional relief as the Court finds just and proper.

Dated: New York, New York
          February 18, 2008

LAW OFFICES OF EVAN SARZIN, P.C.

By: _____
        EVAN SARZIN, ESQ. (ES-3709)

        Attorneys for Plaintiff
        40 Exchange Place, Suite 1300
        New York, New York 10005
        (212) 344-6500

22